OPINION
{¶ 1} On February 14, 2000, Neeraj Saraf filed a complaint in the Franklin County Court of Common Pleas against Maronda Homes, Inc. of Ohio ("Maronda"). Mr. Saraf set forth claims of breach of contract, negligence, breach of express and implied warranties, fraud, unjust enrichment and violation(s) of the Ohio Consumer Sales Practice Act ("CSPA"). The claims arose out of a contract for the sale of a lot and for the construction and sale of a house upon such lot. The complaint averred that Mr. Saraf had noticed certain "material" problems during the construction of the house and had informed Maronda of such problems, but Maronda had refused to repair the deficiencies. Further, Mr. Saraf asserted that he had requested his inspector be present at the presettlement inspection but that Maronda refused this request. The complaint also averred that the construction of the house was not completed within one year of the contract.
 {¶ 2} Mr. Saraf asserted that Maronda's acts constituted breaches of the contract which excused him from any further duties under the contract. Further, Mr. Saraf averred that he had paid certain sums as deposits, which he had demanded be returned, but that Maronda had refused to return the deposits. Mr. Saraf asserted that Maronda's conduct also constituted unfair, deceptive and unconscionable consumer sales practices in violation of the CSPA.
 {¶ 3} A bench trial was held. On March 20, 2002, the trial court journalized an entry finding in favor of Mr. Saraf on his claim for unjust enrichment and awarding him $7,725. The trial court found in favor of Maronda on Mr. Saraf's remaining claims for breach of contract, violation(s) of the CSPA, fraud, negligence and breach of express and implied warranties.
 {¶ 4} Maronda has filed an appeal with this court, assigning the following as error:
 {¶ 5} "The trial court erred in granting Appellee-Cross Appellant judgment on the basis of unjust enrichment."
 {¶ 6} Mr. Saraf has filed a cross-appeal, assigning the following as error:
 {¶ 7} "The decision of the trial court, in finding that Appellant/Cross-Appellee did not violate the Ohio Consumer Sales Practices Act, was contrary to law."
 {¶ 8} For the sake of clarity, we will hereinafter refer to Maronda as "appellant" and to Mr. Saraf as "appellee."
 {¶ 9} We address appellant's assignment of error first. Appellant contends the trial court erred in granting judgment in favor of appellee on his claim for unjust enrichment. The trial court awarded appellee $7,725 on the unjust enrichment claim, representing the total amount of two deposits made by appellee. Appellant asserts that the contract controlled the dealings between the parties, including issues relating to deposits, and therefore, a judgment based on the theory of unjust enrichment was erroneous. For the reasons that follow, we agree with appellant's assertions.
 {¶ 10} The elements of unjust enrichment or quasi-contract are: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. Hambleton v. R.G. Barry Corp. (1984), 12 Ohio St.3d 179, 183. In Banks v. Nationwide Mut. Fire Ins. Co. (Nov. 28, 2000), Franklin App. No. 99AP-1413, this court explained in more detail the doctrine of unjust enrichment:
 {¶ 11} "The doctrine of unjust enrichment provides an equitable remedy, under which the court implies a promise to pay a reasonable amount for services rendered where a party has conferred a benefit on another without receiving just compensation for his or her services. Thus, under the theory of quantum meruit, a party may recover compensation in the absence of a contract where an unjust enrichment would result if the recipient were permitted to retain the benefit without paying for it. Paugh Farmer, Inc. v. Menorah Home for Jewish Aged (1984), 15 Ohio St.3d 44; Fox Associates Co. v. Purdon (1989), 44 Ohio St.3d 69.
 {¶ 12} "Under these equitable principles, a contract is implied as a legal fiction under a theory of quasi-contract, which does not rest on the written intent between the parties but is imposed to prevent injustice. Paugh, supra at 46. Where, however, a written contract between the parties addresses the matter in dispute, the contract governs the parties' performance, unless the contract is void due to illegality, fraud, or otherwise cannot govern the relationship. Generally, where damages are available for breach of contract or in tort, the party cannot also invoke the equitable remedy for unjust enrichment. Rather, if no remedy is available in contract or tort, then the equitable remedy in unjust enrichment may be afforded to prevent injustice." Id. at 10-11.
 {¶ 13} We note first that the claim asserted by appellee does not squarely fit under the usual fact pattern associated with unjust enrichment claims. For example, appellee did not render services for the benefit of appellant and failed to get compensated for such services. Rather, appellee has merely asserted that he paid deposits to appellant and that such deposits should have been returned. Notwithstanding the atypical fact pattern at issue here, we apply the general analyses associated with unjust enrichment claims and conclude that the trial court erred as a matter of law in rendering judgment in favor of appellee on his unjust enrichment claim.
 {¶ 14} The trial court erred in finding in favor of appellee on his unjust enrichment claim because the contract between the parties addressed the matter in dispute, i.e., deposits. Indeed, deposits were dealt with extensively in the contract. Specifically, the contract stated:
 {¶ 15} "2. Purchase Price: The purchase price of the above lot, together with the house * * * shall be One Hundred Fifty-Four Thousand Five Hundred Dollars * * * which sum shall be paid as follows:
 {¶ 16} "(a) Initial deposit accompanying this Agreement. $2,000.
 {¶ 17} "(b) Additional deposit to be due and payable within 30 days. $5,725.
 {¶ 18} "(c) Balance of purchase price due and payable in cash at closing. $146,775. SELLER RETAINS THE RIGHT TO USE ALL DEPOSITS FOR CONSTRUCTION OR OTHER PURPOSES AND BUYER ACKNOWLEDGES THAT SUCH DEPOSITS SHALL NOT BE SUBJECT TO ANY ESCROW, TRUST OR SECURITY AGREEMENT.
 {¶ 19} "* * *
 {¶ 20} "6. Models and Plans: * * * Buyer's refusal to accept the house as built shall constitute a breach of this Agreement for which Seller may retain all deposits and exercise all other remedies pursuant to paragraph 18 herein.
 {¶ 21} "7. Lots: * * * In the event that the type of house desired by Buyer will not fit on the lot within subdivision requirements, Seller shall so notify Buyer and this Contract shall be terminated and the deposits returned to Buyer and the parties shall be released from all further liability hereunder.
 {¶ 22} "* * *
 {¶ 23} "11. Completion:
 {¶ 24} "* * *
 {¶ 25} "(e) * * * If development of the Community has not been completed through no fault of the Seller within one hundred eighty (180) days after the estimated time of completion of the Community, or it is determined by Seller that the lot is unbuildable (as a result of soil conditions or otherwise), then Seller may terminate this Agreement by written notice to Buyer and any deposits hereunder shall be returned to Buyer by Seller. However, Seller shall not be obligated to make, provide or compensate for any accommodations to Buyer as a result of construction delays or any other delays in completion of said house and closing of this sale. Further, such delays shall not serve to cancel, amend or diminish any of the Buyer's obligations herein undertaken.
 {¶ 26} "* * *
 {¶ 27} "12. Delays: The parties hereto agree that in the event the progress of the subject house is delayed at any time by strikes, war or the declaration of a national emergency, or in the event of a disaster or loss to the construction site by act of God or other cause, then and in such event, the Seller may, at its option, (a) extend all time periods contained herein for a period of time equal to such delays, or (b) refund to Buyer the deposit and this Agreement shall be deemed terminated and the parties shall be released of any and all responsibility hereunder.
 {¶ 28} "* * *
 {¶ 29} "16. Closing Documents: * * *
 {¶ 30} "If the title to all or part of the real estate to be conveyed is defective or unmerchantable, or if any part of the real estate is subject to liens, encumbrances, easements, conditions or restrictions other than those excepted in this Agreement, or in the event of any encroachment, Seller shall have a reasonable amount of time, not to exceed thirty (30) days after written notice thereof, within which to remedy or remove any such defect, lien, encumbrance, easement, condition, restriction or encroachment, or obtain title insurance against the same, provided however, that if Seller fails to cure such defect in title within the said 30 day period, either party shall have the right to rescind this Agreement. In the event of such rescission, Seller shall refund to the Buyer all deposits received and the parties shall be released from all further liability hereunder.
 {¶ 31} "* * *
 {¶ 32} "18. Default by Buyer: In the event Buyer fails to pay the balance of the deposit, as set forth in paragraph 2(b) herein, when due, it is agreed between the parties hereto that the initial deposit, as set forth in paragraph 2(a) herein, shall be retained by Seller as liquidated and agreed damages for Buyer's default and/or failure to perform and thereupon all parties hereto shall be relieved of further liability each to the other, it being acknowledged and agreed that the exact amount of damages which would be sustained by Seller is not and will not be susceptible of specific ascertainment.
 {¶ 33} "In the event of default by Buyer after the additional deposit, as set forth in paragraph 2(b) herein, has been paid to Seller, Seller shall, in addition to other rights and remedies in law and in equity available to Seller, at the sole option of Seller, be entitled to elect one of the following rights and remedies:
 {¶ 34} "(a) To retain the entire deposit as liquidated damages to the reasons set forth above and agreed to by all parties hereto, in which event all such parties shall be relieved of further liability each to the other, or:
 {¶ 35} "(b) To apply the entire deposit on account and proceed with an action at law for damages for breach of contract or recovery of the balance of the purchase price.
 {¶ 36} "19. Default by Seller: In the event of default by Seller in the performance of the Agreement without default by Buyer under this or any related Agreement, and provided the contingencies for closing hereunder and thereunder have occurred as provided, Buyer may not claim damages (direct or consequential) but may elect upon giving Seller five (5) days prior written notice to receive a refund of all monies paid on account of the purchase price plus interest at the rate of nine percent (9%) per annum as liquidated damages in which event this Agreement will become null and void and both parties will be released from all further liability under this Agreement, since it is agreed that Buyer's damages will be difficult to ascertain and that monies paid on account of the purchase price plus interest at the rate of nine percent (9%) per annum constitute reasonable liquidated damages and not a penalty."
 {¶ 37} Because a written agreement existed between the parties that addressed the matter in dispute — return/retention of deposits — the equitable remedy of unjust enrichment was not available to appellee to obtain return of such deposits. Any issues surrounding deposits would have had to have been dealt with under the breach of contract claim. We note that appellee did not appeal any ruling of the trial court other than the trial court's finding that there was no violation of the CSPA. Thus, any finding by the trial court that no breach of contract occurred here is now conclusive.
 {¶ 38} Given all the above, the trial court erred in awarding appellee $7,725, representing the total amount of deposits made, on appellee's unjust enrichment claim as the issue of deposits was addressed in the written agreement. Accordingly, appellant's sole assignment of error is sustained.
 {¶ 39} We now address appellee's cross-appeal. Appellee's sole assignment of error asserts the trial court erred in finding that appellant had not violated the CSPA. Appellee contends appellant engaged in unfair, deceptive and unconscionable acts, in violation of the CSPA, by inducing him into entering the contract without advising him of the policy against allowing the buyer to have an inspector at the presettlement inspection of the house, in not allowing appellee's inspector to attend the presettlement inspection, and in retaining appellee's deposits when appellee refused to attend the presettlement inspection without his own inspector.
 {¶ 40} Appellant asserts that appellee never made the argument below that appellant violated the CSPA by failing to inform him of a policy that the buyer's inspector was not allowed to attend a presettlement inspection. Appellant contends that appellee's theory at trial was that appellant's faulty construction of the home constituted violations of the CSPA. A review of the record before us shows that, in general, appellee's CSPA claim was based on all allegations of wrongdoing by appellant. Therefore, we cannot proscribe appellee's argument on appeal on a theory that the arguments were not raised below. Thus, appellee's argument will be addressed.
 {¶ 41} We note first that the CSPA has no application in a "pure" real estate transaction; however, it does apply to so-called "mixed" transactions that also involve the transfer of consumer goods, for example. See Brown v. Liberty Clubs, Inc. (1989), 45 Ohio St.3d 191,193. Numerous courts of appeals have held that the CSPA applies to transactions involving new home construction. See Inserra v. J.E.M. Building Corp. (Nov. 22, 2000), Medina App. No. 2973-M; Fesman v. Berger (Dec. 6, 1995), Hamilton App. No. C-940400; Keiber v. Spicer Construction Co. (1993), 85 Ohio App.3d 391. See, also, Palmer v. Daniel Troth 
Son Builders, Inc. (May 19, 1998), Franklin App. No. 97APE08-1050 and Ohio Adm. Code 109:4-3-01(C)(2) ("services" includes the construction of a single-family dwelling unit by a supplier on the real property of another). Given the case law and facts presented here, we find that the CSPA is applicable.
 {¶ 42} R.C. 1345.02 addresses unfair or deceptive practices and states, in pertinent part:
 {¶ 43} "(A) No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.
 {¶ 44} "(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:
 {¶ 45} "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;
 {¶ 46} "(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;
 {¶ 47} "* * *
 {¶ 48} "(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section[.]"
 {¶ 49} R.C. 1345.03 addresses unconscionable consumer sales practices and states, in pertinent part:
 {¶ 50} "(A) No supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.
 {¶ 51} "(B) In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:
 {¶ 52} "(1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect his interests because of his physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;
 {¶ 53} "(2) Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;
 {¶ 54} "(3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;
 {¶ 55} "* * *
 {¶ 56} "(5) Whether the supplier required the consumer to enter into a consumer transaction on terms that the supplier knew were substantially one-sided in favor of the supplier;
 {¶ 57} "(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to his detriment[.]"
 {¶ 58} We note first that as to R.C. 1345.02(A), the case law generally focuses on "deceptive" acts, presumably because the fact patterns involve some sort of false or misleading representations. However, R.C. 1345.02(A) also expressly prohibits "unfair" acts or practices. Appellee does not specifically allege that appellant engaged in false or misleading representations. Rather, appellee asserts that appellant acted unfairly or unconscionably, in violation of the CSPA, in not allowing appellee to bring his own inspector to the presettlement inspection. The term "unfair" is not defined in the statute. Therefore, it is given its common and ordinary meaning. "Unfair" is defined as, "* * * marked by injustice, partiality, or deception: UNJUST 2: not equitable in business dealings[.]" Webster's Ninth New Collegiate Dictionary (1987) 1288. As for unconscionable practices under R.C. 1345.03, the only subsection that would arguably apply here is R.C. 1345.03(B)(5).
 {¶ 59} The question then becomes whether appellant's refusal to allow appellee to bring his own inspector to the presettlement inspection constituted an unfair or unconscionable act or practice in violation of the CSPA. This determination obviously involves a review of the evidence, although we note that the pertinent facts are not in dispute. Indeed, it is undisputed that appellant denied appellee's request to have his own inspector be present. However, appellant argues, in essence, that it was under no obligation to allow appellee's inspector be present at the presettlement inspection and that it was policy to not allow a buyer's inspector to attend the presettlement inspection.
 {¶ 60} Appellant points to a written document signed by the parties which stated:
 {¶ 61} "PRESETTLEMENT REQUIREMENTS
 {¶ 62} "MARONDA HOMES INC. OF OHIO TAKES PRIDE IN DELIVERING A QUALITY BUILT TROUBLE FREE HOME. FOR THAT REASON, WE SCHEDULE A PRESETTLEMENT INSPECTION BETWEEN THE SUPERVISOR AND YOU. AT THAT TIME, YOU WILL HAVE THE OPPORTUNITY TO GO THROUGH THE HOUSE AND ASSURE YOURSELF WORK HAS BEEN COMPLETED IN ACCORDANCE WITH YOUR CONTRACT. IF THERE IS ANYTHING THAT MUST BE DONE, WE WOULD LIKE TO HAVE IT COMPLETED PRIOR TO CLOSING, EXCEPT FOR ITEMS THAT CANNOT BE DONE UNTIL WEATHER PERMITS.
 {¶ 63} "THEREFORE, IT IS UNDERSTOOD THAT THERE IS A MINIMUM OF 5 WORKING DAYS NEEDED FROM THE TIME OF THE PRESETTLEMENT TO THE DAY OF THE CLOSING TO COMPLETE THE WORK." (Emphasis added.)
 {¶ 64} The evidence shows that appellee had informed appellant of certain problems he perceived with the construction. For example, appellee was told by one of appellant's representatives that the cracks in the basement were "typical" and minor and did not pose a problem. Appellee requested that his inspector attend the presettlement inspection. Appellant refused to allow this and told appellee that the only parties allowed at the inspection were appellant and appellee himself. Appellee testified that appellant's representative told him to show up at the inspection or it would occur without him. (Tr. at 70.)
 {¶ 65} Certainly, it is not unreasonable for a consumer to want to have his or her own inspector judge the gravity and/or implication of any perceived defect. More importantly, however, appellant specifically represented that appellee could inspect the house. Appellant was the expert on home construction, not appellee, and appellee should have been able to have his own "expert" present at the inspection to represent appellee's interest.
 {¶ 66} It must be kept in mind that this was a consumer transaction involving the construction of a new home. Appellant's overly narrow interpretation of the language above, specifically, the word "you," is inconsistent with the intent the CSPA and is patently unfair under these circumstances. Appellant represented to appellee that he ("you") had the opportunity to go through the house to assure that work was completed in accordance with the contract. Clearly, appellee could bring, at his expense, his agent/representative (i.e., his own home inspector) to such inspection. Obviously, the consumer himself or herself lacks the expertise to recognize certain defects in workmanship, especially latent problems. It was unfair and/or unconscionable of appellant to refuse to allow appellee's inspector to attend such inspection, especially in light of the alleged problems appellee brought to appellant's attention prior to the inspection.
 {¶ 67} Given the specific facts of the case before us, we conclude that appellant committed an unfair and/or unconscionable act in refusing to allow appellee's own inspector be present at the presettlement inspection. The trial court erred as a matter of law in failing to so conclude. For this reason, appellee's assignment of error is sustained.
 {¶ 68} As indicated above, the trial court had awarded appellee $7,725 on the unjust enrichment claim, representing the deposits retained by appellant. Such monetary award was improper as to the unjust enrichment claim. However, appellee should have been awarded such amount for the violation(s) of the CSPA. Closing on the home did not occur because appellee did not attend the presettlement inspection. Appellee did not attend the presettlement inspection because appellant would not allow appellee to bring his own home inspector. Despite the fact that no closing occurred, appellant retained appellee's deposits. As indicated above, it was an unfair act or practice for appellant to refuse appellee's request. Appellant should not be allowed to retain appellee's deposits under these circumstances. Therefore, an award equaling the amount of such deposits is proper.
 {¶ 69} We note that treble damages are not available to appellee under the CSPA because, pursuant to R.C. 1345.09(B), the violation here was not an act or practice that has been declared unconscionable by rule adopted under R.C. 1345.05(B)(2) or so determined by a state court decision which has been made available for public inspection pursuant to R.C. 1345.05(A)(3). Further, attorney fees are unavailable under R.C.1345.09(F)(2) because there is no evidence that appellant knowingly committed a violation. While appellant certainly knowingly refused to allow appellee's home inspector to attend the inspection, the evidence does not show that this was a knowing violation of the CSPA.
 {¶ 70} In summary, appellant's assignment of error is sustained, and appellee's assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas awarding appellee $7,725 is affirmed, albeit for different reasons. Accordingly, the matter is remanded to the trial court with instructions to vacate that portion of the judgment which found in favor of appellee on the unjust enrichment claim and to enter judgment in favor of appellee for $7,725 on the CSPA claim.
Judgment affirmed and cause remanded with instructions.
KLATT and BOWMAN, JJ., concur.